## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES HENRY
3514 Perrin Drive,
Haw River, NC 27258

ALCRESTA THERAPEUTICS, INC.
One Newton Executive Park
Suite 100
Newton, MA 02462

                               Plaintiffs,

v.

ALEX M. AZAR II
Secretary of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201,

                               Defendant.

Civ. No. _____

## <u>COMPLAINT</u>

## I.    NATURE OF ACTION

1.    This is an action under the Administrative Procedure Act for judicial review and declaratory and injunctive relief from a determination to grossly underpay and effectively deny Medicare coverage for a novel medical device prescribed for a lung transplant patient in need of specialized enteral nutrition.  After the Court of Appeals found that the agency could not deny a useable medical code for the product necessary to pursue Medicare coverage and payment, the same result has been accomplished through a different means—an improperly and artificially low payment level.

2.    The payment determination should be overturned because it violates the Medicare statute and related agency rules prescribing the reasonable charge-based payment methodology for

new enteral nutrition products and requiring Medicare coverage for medically necessary enteral nutrition, and violates the D.C. Circuit's order that the Secretary remove barriers to payment. The determination is also invalid as arbitrary and capricious action lacking any reasonable basis, or explanation whatsoever, for departing from both the standard gap-filling methodology and the Secretary's long-standing determination to provide Medicare coverage for enteral nutrition items like RELiZORB where medically necessary, and for yielding payment far below the supplier's acquisition price and out of line with other payors' reimbursement levels. The payment determination is also unsupported by substantial evidence; there is no evidence to support a connection between the apparent starting point for the Medicare payment and the supplier's actual reasonable charges for the product. Finally, the agency effected these substantive changes to longstanding Medicare payment and coverage provisions without observance of the required agency procedure, including notice and opportunity for public comment, or fair notice of the standard change before applying it to Mr. Henry's claim. The payment determination should thus be set aside and the agency directed to take action to ensure proper Medicare payment for the product.

## II.    JURISDICTION AND VENUE

3.     Jurisdiction is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 1395ff(f).

4.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(e).

## III.    THE PARTIES

5.     Plaintiff James Henry is a Medicare beneficiary suffering from cystic fibrosis with pulmonary manifestations whose physician prescribed RELiZORB to improve his health and address, in particular, his lung function and malnourishment.

6.     Plaintiff Alcresta Therapeutics, Inc. is a small company focused on innovative enzyme-based products designed to address nutritional challenges faced by medically fragile persons living with gastrointestinal disorders and rare diseases.   Alcresta developed and manufactures RELiZORB, a digestive enzyme-packed device that enhances enteral feeding for the sickest and most vulnerable of patients with cystic fibrosis, pancreatitis, pancreatic cancer, or other serious diseases who suffer from fat malabsorption and are, as a result, severely malnourished, underweight, have decreased lung function, and suffer from significant gastrointestinal symptoms. RELiZORB helps the digestive process by breaking down fats in enteral tube feeding formula into an absorbable form, enabling patients to absorb more calories and the essential fatty acids that are critical for growth and development, as well as reduce gastrointestinal symptoms associated with fat malabsorption.   Alcresta is headquartered in Newton, Massachusetts.

7.     Defendant Alex M. Azar II is the Secretary of Health and Human Services ("HHS").   References to the Secretary are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

8.     The Centers for Medicare & Medicaid Services ("CMS") is the operational component of HHS to which the Secretary has delegated authority to oversee the operations of the Medicare program, as well as a nationwide, standard coding medical system known as Healthcare Common Procedure Coding System ("HCPCS") that is used by health care providers, suppliers, and patients in submitting claims to all health care payors, including private insurers, Medicare, and Medicaid.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.  Medicare Coverage and Payment for Enteral Nutrition

9.      The Medicare program, administered by CMS, provides health insurance for aged and disabled Americans under Title XVIII of the Social Security Act, the Medicare Act.  42 U.S.C. § 1395 *et seq.*

10.     Part B of the Medicare Act offers beneficiaries coverage for certain medically necessary and reasonable costs for "medical and other health services," including enteral nutrition products.  42 U.S.C. §§ 1395k(a)(2)(B) (providing Part B coverage for "medical and other health services,"), 1395k(a)(2)(I) (providing Part B coverage for "prosthetic devices"); 42 C.F.R. § 421.210(b)(2) (designating Durable Medical Equipment, Prosthetics, and Orthotics ("DMEPOS") claims as including enteral nutrition and supplies); Medicare Benefit Policy Manual, ch. 15, § 120.A (agency defining "prosthetic devices" to include "parenteral and enteral (PEN) nutrition"); Medicare Claims Processing Manual ("Manual"), ch. 20, § 10 (establishing the claim payment process for PEN items and stating that PEN items fall under Durable Medical Equipment Medicare Administrative Contractor ("DME MAC") payment approvals).

11.     A "national coverage determination" ("NCD") is "a determination by the Secretary with respect to whether or not a particular item or service is covered nationally" by Medicare.  42 U.S.C. § 1395ff(f)(1)(B); 42 U.S.C. § 1395y(l)(6)(A).

12.     The statutorily prescribed procedure for issuing or revising a national coverage determination requires (1) notice and opportunity for public comment on a draft proposed determination; (2) meetings of advisory committees made on the record with respect to the determination; (3) consideration of applicable clinical experience and medical, technical, and scientific evidence with respect to the subject matter of the determination; and (4) a clear statement in the final determination of the basis for the determination (including responses to comments

received from the public), the assumptions underlying that basis, and the availability to the public of the data (other than proprietary data) considered in making the determination.  42 U.S.C. §§ 1395y(a), 1395y(l)(1)-(4).

13.     In 1984, CMS adopted an NCD for Enteral and Parenteral Nutritional Therapy (180.2), providing that enteral nutrition is considered "reasonable and necessary" where "a patient with a functioning gastrointestinal tract who, due to pathology to, or non-function of, the structures that normally permit food to reach the digestive tract, cannot maintain weight and strength commensurate with her or her general condition."[1]

14.     The Medicare statute and regulations generally provide for payment under a nationwide fee schedule for enteral nutrition based on reasonable charges from the prescribed time period.  P.L. 105-33 § 4315 (establishing the fee schedule for DMEPOS based on reasonable charges); 42 U.S.C. §§ 1395u(a), (s) (calling for use of "[M]edicare [A]dministrative [C]ontractors" to administer Part B based on reasonable charges); 42 U.S.C. § 1395m(a)(2)-(3), (8)-(9) (mandating that the fee schedule amounts for DME generally be based on average reasonable charges from 1986 and/or 1987, increased by annual covered item update factors); 42 C.F.R. § 405.502 (criteria for determining reasonable charges); 42 C.F.R. § 414.102(a) (establishing general payment rules, including the use of a national fee schedule for parenteral and enteral nutrition items and services); 66 Fed. Reg. 45,173, 45,174 (Aug. 28, 2001) (implementing fee schedule payment methodology for "parenteral and enteral nutrients"); 83 Fed. Reg. 56,922, 57,046 (Nov. 14. 2018) (updating fee schedule for durable medical equipment, including

---

[1] *See National Coverage Determination (NCD) for Enteral and Parenteral Nutritional Therapy (180.2),* CMS.gov (July 11, 1984), https://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=242&ncdver=1&DocID=180.2&SearchType=Advanced&bc=IAAAABAA AAAA&.

parenteral and enteral nutrition products, and explaining the fee schedule is based on reasonable charge payment periods set forth in the statute). CMS adopts the fee schedule on a periodic basis. *See* 42 C.F.R. § 414.210(g) (discussing fee schedule adjustments for competitive bidding programs); 42 C.F.R. § 414.105 (applying the methodologies set forth at § 414.210(g) to the fee schedule amounts for enteral nutrients, equipment, and supplies); 42 C.F.R. § 414.422(b) (specifying that the competitive bidding contracts must be recompeted at least every three years).

15.     CMS also administers HCPCS, the nationwide, standard coding system that is used by health care providers, suppliers, and patients in submitting claims to all health care payors, including private insurers, Medicare, and Medicaid. 42 U.S.C. § 1320d-2; 45 C.F.R. § 162.1002.

16.     CMS established a "Workgroup" to make recommendations on requests for new codes. 66 Fed. Reg. 58,743, 58,744 (Nov. 23, 2001). The Workgroup's final decision becomes the final agency decision. *See* CMS, Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures, 9 (Nov. 26, 2019) (hereinafter "2019 Coding Guidelines")[2]; 76 Fed. Reg. 24,034, 24,034 (Apr. 29, 2011). The Workgroup consists of members from CMS, other federal agencies, state Medicaid agencies, and the private insurance sector. 2019 Coding Guidelines.

17.     An item qualifies for a new code if it (a) performs a significantly different function than, or (b) operates differently from, or (c) has a significant therapeutic distinction from other HCPCS Level II-coded products. *See* HCPCS Decision Tree at 1.

18.     This coding plays a critical role in the success of new medical devices because a separate code is a necessary predicate to payment or coverage by public and private insurers. *See*

---

[2]  https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2018-11-30-HCPCS-Level2-Coding-Procedure.pdf.

*Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 4-5 (D.C. Cir. 2018) 5 (despite that "[c]oding and pricing may well be two separate processes," "[h]ere, Relizorb's encumbered code acts as an absolute barrier to meaningful reimbursement," and it is "reasonably possible that a new billing code would prompt HHS to reimburse Relizorb separately").  Without a valid code, a medical claim cannot be processed, paid, covered, or even appealed.  *See id.* (describing the importance of coding decisions).

19.      By statute, the coding process must entail public notice and consultation.  *See* 42 U.S.C. § 1395l app. § 531(b) (directing HHS to establish procedures that provide for public consultation for the coding and payment determinations for new durable medical equipment ("DME")); 66 Fed. Reg. at 58,744 (establishing procedures for public consultation for coding and payments determinations for DME).

20.      For a newly coded product that is not yet on the national fee schedule, a Medicare contractor is required to set a payment amount based on a predetermined "gap-filling" methodology reflecting suppliers' reasonable charges for the product and local pricing factors.  *See* 42 U.S.C. § 1395u(a), (s) (calling for use of "[M]edicare [A]dministrative [C]ontractors" to administer Part B based on reasonable charges); 42 U.S.C. § 1395m(a)(2)-(3), (8)-(9) (mandating that the fee schedule amounts for DME generally be based on average reasonable charges from 1986 and/or 1987, increased by annual covered item update factors); 42 C.F.R. § 414.102(a) (requiring payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service"); Manual, ch. 23, §§ 60, 60.3 (directing contractors to "gap-fill" the fee schedule "for items for which charge data were unavailable during the fee schedule data base year" using supplier prices when there is no national or neighboring regional fee schedule amount for the new item or other comparable equipment); 42 U.S.C. § 1395m(a)(14)(L) (describing payment

rules for covered DME items).  *See also Almy v. Sebelius*, 749 F. Supp. 2d 315, 332-33 (D. Md. 2010) (distinguishing locally-established gap-filled payment amounts from national fee schedule amounts); *affirmed* 679 F.3d 297, 311 n.4 (4th Cir. 2012) (same).

21.     The Manual explains that the gap-filling process requires updating the base year reasonable charges for an item to the current year's price by deflating current charges to the relevant base year, then updating that figure to reflect increases in the consumer price index over time.  Manual, ch. 23, § 60.3.  The relevant base year is 1995.  42 C.F.R. § 414.104(b) (establishing 1995 base year for PEN from 2002 onwards).

22.     For purposes of deriving payment for DMEPOS, including enteral nutrition, "reasonable charge determinations are generally based on customary and prevailing charges derived from historic charge data."  72 Fed. Reg. 17,992, 17,994 (Apr. 10, 2007); Manual, ch. 20, § 10.  To determine customary charges, Medicare contractors are required to use, "to the extent possible, the actual charges for services rendered during the year ending June 30 immediately preceding the start of the fee screen year."  Manual, ch. 23, § 80.3.l.

23.     But, the Manual contemplates the use of other data for "new services," Manual, ch. 23, § 80.2, and provides that "[c]ustomary charges may be established using price lists" of the supplier "when there is inadequate charge data," *id.* § 80.3.1.  *See id.* § 60.3 (discussing use of "supplier price lists" in gap-filling).  "In this case, use only the fees charged and the price lists in effect as of December 31 of the data base year."  *Id.* § 80.3.1.  The Manual separately provides that "[i]f it is necessary to establish customary charges using price lists, [Durable Medical Equipment Medicare Administrative Contractors] use these customary charges to also establish the required prevailing charges (*See* § 80.3.1.)."  *Id.* § 80.4.

8

24.     After determining the reasonable charges, the Manual requires the application of certain adjustment factors to arrive at the gap-filled amount if the charges are not from the 1995 base year for parenteral and enteral nutrition items.  Manual, ch. 23, § 60.3; *see* 42 U.S.C. § 1395u(s)(2)(D) (establishing the PEN fee schedule); P.L. 105-33 § 4551(b) (establishing 1995 base year for PEN fee schedule for 1998 to 2002); 42 C.F.R. § 414.104(b) (establishing 1995 base year for PEN fee schedule from 2002 onwards).

25.     First, a deflation factor specified in the current year implementation instructions is applied to the charges in order to approximate charges for the 1995 base year.  Manual, ch. 23, § 60.3.  Second, the result of applying the deflation factor is updated to the current year by applying the "cumulative" updates.  *Id.*[3]  Payment is 80% of the amount calculated after application of these adjustment factors.  *See* 42 C.F.R. § 414.102(a) (requiring payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service" for a newly coded product that is not yet on the national fee schedule).

**B.  Challenges to Medicare Contractor Claims Determination**

26.     Medicare Administrative Contractors make initial determinations on Medicare coverage and payment.  42 C.F.R. §§ 405.920, 405.924(b); *see also* 42 C.F.R. § 421.400 (codifying use of Medicare Administrative Contractors); 42 CF.R. § 421.100 (contractors "determin[e] the amount of payments to be made" on claims).  When making claim determinations, Medicare Administrative Contractors are bound by the Medicare Act, the controlling regulations, applicable National Coverage Determinations, as well as agency manuals.  *See* 42 U.S.C. § 1395kk-1

---

[3]   *See* 2019 Update for DMEPOS Fee Schedule, CMS.gov, 5 (Jan. 2019), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM11064.pdf ("For gap-filling pricing purposes, deflation factors are applied before updating to the current year."); *see also* 42 U.S.C. § 1395m(a)(14)(L) (describing payment rules for covered DME items).

(authorizing use of contractors to determine "the amount of the payments required pursuant to [the Medicare Act],"); 42 C.F.R. § 405.1063 ("All laws and regulations pertaining to the Medicare and Medicaid programs," are binding in claims process); 42 C.F.R. § 405.1060(a)(4) ("An NCD is binding" on program contractors); Manual, ch. 1, § 01 ("[T]he instructions in this chapter apply . . . to the contractors that process [Medicare] claims.").

27.     A party dissatisfied with the Medicare Administrative Contractor's initial determination may pursue an appeal by first requesting a "redetermination" by the same contractor. 42 U.S.C. § 1395ff(a)(3)(A); 42 C.F.R. §§ 405.906, 405.940, 405.942.  Medicare beneficiaries and suppliers are considered parties to an initial determination with appeal rights, while device manufacturers like Alcresta are not parties and therefore have no administrative recourse. *See* 42 C.F.R. §§ 405.906(a)(1)-(2) (defining parties to initial determinations).

28.     If the party remains dissatisfied after this first level of administrative appeal, the party may pursue the claim further through the administrative appeals process.  42 U.S.C. § 1395ff(c)(3)(B), (d)(1)(A); 42 C.F.R. §§ 405.960, 405.1000, 405.1048, 405.1102, 405.1110. The second appeal level is a "reconsideration" conducted by a different contractor the agency calls a "Qualified Independent Contractor," ("QIC"), 42 U.S.C. § 1395ff(c) (establishing reconsiderations by QICs); 42 C.F.R. § 405.960 *et seq.* (explaining reconsideration process).  That contractor's decision is subject to review by an Administrative Law Judge, 42 C.F.R. § 405.1000 *et seq.,* and the administrative process culminates with a review by the Medicare Appeals Council, 42 C.F.R. § 405.1100 *et seq.*  Decisions of the Medicare Appeals Council are considered final agency determinations subject to judicial review.  42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1136.

29.     The regulations define the kind of Medicare "initial determinations" that may be pursued through the administrative appeals process.  42 C.F.R. §§ 405.906, 405.920 *et seq.*

(defining initial determinations and parties to initial determinations).  The adjudicator may decide at each level whether the determination meets this definition.  *See* 42 C.F.R. § 405.940 (only a party to an initial determination may request a redetermination); 42 C.F.R § 405.972(b)(1) (allowing QIC to dismiss appeals not raised by party to initial determination); 42 C.F.R. §§ 405.1052(a)(2), (4) (allowing ALJs to dismiss appeals when party has no right to an appeal); 42 C.F.R. § 405.1114 (allowing Appeals Council to dismiss appeal when party has no right to an appeal).  When a claim appeal is dismissed, including dismissal for not meeting this definition, that dismissal may generally be reviewed by the next level review entity.  *See* 42 C.F.R. § 405.974 (allowing for QIC review of dismissed redetermination request); 42 C.F.R. § 405.1004 (allowing for ALJ review of dismissed reconsideration request).  But agency regulations prohibit further administrative review after a dismissal at one level of appeal and affirmance of that dismissal at the next level.  *See* 42 C.F.R. § 405.974(b)(3) (a QIC's review of a lower contractor's dismissal is binding and not subject to further administrative review); 42 C.F.R. § 405.1054 (ALJ dismissal of a request for review of a QIC dismissal of a request for reconsideration is binding and not subject to further review); 42 C.F.R. § 405.1116 (Medicare Appeals Council dismissal of a request to review an ALJ dismissal is "binding and not subject to further review").  In these circumstances, judicial review is available because a party "can obtain no review at all unless it can obtain judicial review in a § 1331 action."  *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 20 (2000); *see also Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018) (recognizing as "undisputed" that "despite the[] channeling provisions for Medicare claims, federal-question jurisdiction remains available where necessary to preserve an opportunity for judicial review." (citing *Ill. Council*, 529 U.S. at 19-20)).

30.     There is also a separate statutory provision authorizing an aggrieved beneficiary to pursue judicial review of the establishment of or change to a National Coverage Determination. *See* 42 U.S.C. §§ 1395ff(f)(1)-(3) (establishing process for NCD challenges); 42 C.F.R. § 426.500 *et seq*. (implementing NCD review process); 78 Fed. Reg. 48,164, 48,166 (Aug. 7, 2013) (implementing changes to the NCD review process).

## V.     FACTS SPECIFIC TO THIS CASE

### A.  Alcresta and RELiZORB

31.     Plaintiff Alcresta developed and manufactures RELiZORB, and will be unable to continue providing its product to medically fragile Medicare patients like Mr. Henry and many others if the agency continues not to reasonably and adequately reimburse for RELiZORB.  It is a small "start up" company founded in 2011 to "focus[] on solving one unique unmet medical need: alleviation of fat malabsorption in very ill patients suffering from pancreatic insufficiency." Alcresta spent its first years developing and securing regulatory approval for RELiZORB, which launched in December 2015 shortly after FDA cleared it for prescription use.  RELiZORB is currently the company's lead and only product.  *See* About Alcresta Therapeutics, http://www.alcresta.com/about-alcresta-therapeutics.

32.     RELiZORB facilitates absorption of essential fats in patients suffering from severe fat malabsorption resulting from pancreatic insufficiency associated with cystic fibrosis and other serious pancreatic conditions.  Fat malabsorption can lead to impaired lung function, significant gastrointestinal problems, decreased caloric intake, reduced digestion of essential fats, vitamin deficiencies, and suboptimal brain and vision development.  Fatty acid abnormalities are significant in the cystic fibrosis population.  For example, low omega-3 fatty acid levels have been associated with lower lung function.

33.     RELiZORB mimics normal pancreatic function by breaking down fats in formula used for enteral tube feeding—i.e., delivery of nourishment directly to a patient's gastrointestinal tract—by exposing the formula to a special digestive enzyme immediately before it enters the body.[4]  It is a small, single use cartridge that connects in-line between the feeding pump and the patient as part of the enteral feeding pump tubing set-up.  Clinical trials and other studies provide evidence of RELiZORB's therapeutic benefit, including improvements in fatty acid absorption, omega-3 absorption, frequency and severity of gastrointestinal symptoms from fat malabsorption, higher weight, and appetite.[5]

34.     There is no other effective alternative to hydrolyze fats in enteral formula for seriously ill patients like Mr. Henry.  RELiZORB is the only product currently available that breaks

---

[4] *See Hydrolyze Fats, Normalize Absorption of Fatty Acids*, ALCRESTA THERAPEUTICS, http://relizorb.com/patient/why-relizorb (last visited Apr. 27, 2020); *see also RELiZORB Patient Guide,* ALCRESTA THERAPEUTICS (Jan. 2020)*,* https://www.relizorb.com/docs/pdfs/Relizorb-Patient-Guide.pdf (RELiZORB patient guide describing product and its use); https://www.relizorb.com/docs/pdfs/Relizorb-Instructions-for-Use.pdf (RELiZORB Instructions for Use, including summary of clinical data).

[5] *See* David Orenstein et al., *Safety, Tolerability, and Fat Absorption Using a Novel In-line Digestive Enzyme Cartridge (RELiZORB) in Patients with Cystic Fibrosis Receiving Enteral Nutrition* (Jan. 2017); John Stevens et al., *Long-Term Use of RELiZORB by Children and Adults with CF Receiving Enteral Feeding (EF) Increases Omega 3 Fatty Acid Levels and Improves Nutritional Parameters*, 52 Pediatric Pulmonology (Issue Supplement S47), S1, S450 (Sept. 2017), https://onlinelibrary.wiley.com/doi/epdf/10.1002/ppul.23840; C. Iwanicki, et al., *Use of Immobilized Lipase Cartridge with Overnight Enteral Feeds Improves Symptoms and Results in Weight Gain in Children with Cystic Fibrosis*, 52 Pediatric Pulmonology at S452-53; M. Minor, et al., *Digestive Enzyme Cartridge (RELiZORB) During Continuous Enteral Feeds Among Individuals with Cystic Fibrosis*, 52 Pediatric Pulmonology at S459; S. Hendrix, et al., *Use of an In-Line Digestive Enzyme Cartridge in Pediatric Patients*, 52 Pediatric Pulmonology at S461; Steven D. Freedman et al., *Absorption and Safety with Sustained Use of RELiZORB Evaluation (ASSURE) Study in Patients with Cystic Fibrosis Receiving Enteral Feeding* (Mar. 10, 2018), https://journals.lww.com/jpgn/Abstract/publishahead/Absorption_and_Safety_with_Sustained_Use_of.96711.aspx.

down fats throughout a full enteral feeding session, which may last six to ten hours overnight.[6] Indeed, the FDA cleared RELiZORB in 2015 through the *de novo* process that only applies where there is no substantially equivalent product on the market.   *See* 21 U.S.C. § 360c(f)(2)(A)(ii) (permitting *de novo* clearance); 82 Fed. Reg. 47,969, 47,970 (Oct. 16, 2017) (describing FDA clearance of RELiZORB through the *de novo* process).

## B.  Prior Litigation

35.     Following RELiZORB's FDA clearance in November 2015, and in light of its novel fat hydrolysis technology, Alcresta submitted an application to the HCPCS Workgroup for a unique HCPCS Level II Code for RELiZORB on December 18, 2015. Alcresta's 2016 Alpha-Numeric HCPCS Coding Recommendation (Dec. 2015).  A separate code would allow public and private payors to process claims.

36.     In the spring of 2016, the HCPCS Workgroup issued its preliminary coding determination that RELiZORB was already adequately described by already existing codes B4034, B4035, and B4036, which were for three different types of enteral nutrition supply kits.[7] Two of those codes were for expressly off-label uses of RELiZORB, which is only cleared for use with pump feeding.  *See* FDA Order of Nov. 20, 2015.

37.     On May 31, 2016, Alcresta requested that the Workgroup reconsider its preliminary decision.  Letter from Alcresta to CMS (May 31, 2016).  The HCPCS Workgroup reconvened to

---

[6] *Safety, Tolerability, and Fat Absorption Using a Novel In-line Digestive Enzyme Cartridge (RELiZORB) in Patients with Cystic Fibrosis Receiving Enteral Nutrition* (Jan. 2017); 2018 Alpha-Numeric HCPCS Coding Recommendation Format, Information Supporting Coding Modification Recommendation.

[7] *See* Centers for Medicare & Medicaid Services (CMS) Healthcare Common Procedure Coding System (HCPCS) Application Summaries for DME and Accessories; O & P; Supplies and Other, 16 (June 1, 2016) (document pages unnumbered), https://www.cms.gov/Medicare/Coding/ MedHCPCSGenInfo/Downloads/2016-06-01-HCPCS-Application-Summary.pdf (last visited Apr. 27, 2020).

consider Alcresta's application together with the input provided at the Public Meeting. *Id.* Subsequently, the Workgroup revised its preliminary decision, and denied the request for approval of a new Level II HCPCS code to separately identify RELiZORB, summarily concluding that three existing bundled codes for enteral feeding supply kits adequately described RELiZORB. *Id.*; *accord* Letter from CMS to Alcresta (Nov. 3, 2016).

38.     Alcresta applied again in January 2017 for a separate code.  The Workgroup issued a preliminary decision and again denied the request in June 2017.[8]

39.     Alcresta promptly requested reconsideration before the Workgroup, explaining that RELiZORB is unlike the supply kit items bundled into the existing codes, two of which (B4034 and B4036) do not even concern pump feeding during which RELiZORB is used.  Several stakeholders, including children's hospitals across the country, supported Alcresta's request.  They described improvements in their cystic fibrosis patients as a result of RELiZORB and emphasized the difficulty in patient access due to lack of a separate code, which they explained leads insurers to deny their patients' claims for RELiZORB.

40.     In November 2017, Alcresta received the final decision denying a separate billing code for RELiZORB based on the erroneous conclusion that the device should be included in the bundled standard enteral feeding supply kit encompassed by HCPCS code B4035.[9]  That supply kit includes generic materials such as tubes, dressings, clamps, and tape that are wholly dissimilar from RELiZORB.

41.     In January 2018, Alcresta submitted another application for a separate permanent billing code for RELiZORB.  In May 2018, CMS posted website notice of a purported "preliminary

---

[8] CMS HCPCS Application Summaries for DME and Accessories, *supra* note 7.
[9] *See* CMS HCPCS Application Summaries for DME and Accessories, *supra* note 7.

HCPCS coding recommendation," stating that the enzyme-packed device is still included in the bundled code for the basic enteral feeding supply kit (B4035).

42.    Meanwhile, in early 2018, Plaintiffs Alcresta and a Medicare beneficiary filed a legal action and sought a preliminary injunction to alleviate their ongoing irreparable harm. *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321 (D.D.C. 2018).  To forestall further harm, Plaintiffs sought preliminary injunctive relief that would require HHS to, among other things, strike RELiZORB from the list of products in the bundled code B4035, issue a temporary code pending a decision on the 2018 application for a permanent code, issue a reasoned decision on Alcresta's 2017 application, and adhere to required administrative procedure in considering Alcresta's 2018 application.  *Id.*

43.    In response, in April 2018, CMS removed RELiZORB from the published list of products included in B4035, removed from its website all materials relating to Alcresta's 2017 application, and advised Alcresta by letter that it was rescinding the 2017 decision.  The agency, however, did not issue a new decision on the 2017 application, and still treated RELiZORB as subsumed within the bundled enteral feeding supply kit code B4035.

44.    The following month, the agency issued a unique temporary code (Q9994) for RELiZORB effective July 1, 2018.[10]  But the agency encumbered the Q9994 code with two indicators that rendered it "not valid for Medicare claims processing purposes."  Specifically, Q9994 was encumbered with the coverage indicator "I," which means "not payable" by Medicare, as well as the pricing indicator "00," meaning "not separately priced by Part B (e.g. services not

---

[10] HCPCS Quarterly Update, Other Codes Effective July 1, 2018, https://www.cms.gov/Medicare/ Coding/HCPCSReleaseCodeSets/HCPCS-Quarterly-Update.html (last visited Apr. 27, 2020).

covered, bundled, used by [Medicare] part A only, etc."[11]  The temporary code therefore did not alleviate Plaintiffs' ongoing harm.  Under that code, RELiZORB claims continued to be automatically and categorically rejected as duplicative, with no appeal rights, and Medicare and Medicaid still provided no reimbursement for RELiZORB.

45.     In June 2018, the district court denied Plaintiffs' preliminary injunction motion. Aside from considering the beneficiary's standing in assessing his irreparable harm, the court's decision focused exclusively on irreparable harm and did not balance the four preliminary injunction factors.  *Alcresta*, 318 F. Supp. 3d at 328.  The district court accepted for purposes of the motion that the beneficiary was suffering real, ongoing injuries to his health due to his inability to procure RELiZORB.  But it held that "unfortunately for him, this lawsuit cannot be his means to" obtain relief.  The court concluded (incorrectly) that the beneficiary could challenge lack of reimbursement through administrative remedies.

46.     Plaintiffs appealed, and moved for expedited briefing and an emergency injunction pending appeal.  On July 13, 2018, the Court of Appeals granted the motion for injunction in part, ordering the Secretary "to issue a temporary billing code for Relizorb that is not encumbered with the Medicare-coverage indicator, pending further order of the court."  Per Curiam Order, Jul. 13, 2018.

47.     Rather than issuing a new and unencumbered temporary code, the agency swapped out one improper Medicare-coverage indicator ("I") with another ("D").  The new coverage indicator "D" referred contractors to a provision of the Manual, ch. 20, § 30.7.2, that governs

---

[11] *Annual Update of HCPCS Codes Used for Skilled Nursing Facility Consolidated Billing Enforcement, Updated SNF Help File*, DHHS, CMS (Nov. 8, 2002), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/A02118.pdf; *see also Alcresta*, 755 F. App'x at 3.

bundled supply kits, thus guaranteeing that Medicare claims for RELiZORB would be categorically denied as duplicates. In addition, the agency retained the "00" indicator, ensuring that a claim for RELiZORB still would not be separately priced but would instead receive "00" (zero) reimbursement regardless of patient medical need. Manual, ch. 20, §§ 30.7.2, 110.5. Letter from Centers for Medicare and Medicaid Services to All Medicare Administrative Contractors, on HCPCS code Q9994 (July 20, 2018).

48.     Plaintiffs then moved the Court of Appeals to enforce the July 13 Order on the ground that the agency's implementation of that Order, due to the encumbering indicators, still did not enable Medicare claims processing or appeal rights under the applicable Medicare rules for new products. On July 27, the Court denied the motion "based on the government's representations that the temporary, unique billing code for Relizorb with the new coverage indicator 'now permits claims processing and results in an appealable, initial determination,' and that an appeal from the denial of a claim will not be precluded by 42 C.F.R. § 405.926(c)." Per Curiam Order, Jul 27, 2018.

49.     On November 5, 2018, HHS published its 2019 annual update to the Healthcare Common Procedure Coding System (HCPCS) codes. HHS therein converted the temporary RELiZORB billing code, Q9994, to list it in the annual update as B4105, sequentially with other supplies and formula for enteral and parenteral feeding (also identified by B-four thousand codes), and retained its "D" and "00" coverage indicators. *See* Letter from Alex Azar to Mark Langer, pursuant to Fed. R. App. P. 28(j) (Nov. 6, 2018).

50.     In December 2018, the D.C. Circuit issued its opinion on the pending appeal, granting Plaintiffs' preliminary injunction in part. *See Alcresta*, 755 F. App'x 1, at 2, 6. The Court ordered the Secretary to "assign Relizorb a temporary billing code that is not encumbered by

Medicare coverage indicators that treat Relizorb as a component of the enteral feeding supply kit (coded as B4035) not separately priced or payable." *Id.* at 2.  The Court explicitly acknowledged that "[c]oding and pricing may well be two separate processes," but "[h]ere, Relizorb's encumbered code acts as an absolute barrier to meaningful reimbursement." *Id.* at 4-5.

51.     CMS finally issued RELiZORB a separate HCPCS code on December 3, 2018.  It changed the Medicare coverage indicator for the temporary HCPCS code Q9994 from D "Special Coverage Instructions Apply" to C "Contractor Discretion," and the Medicare pricing indicator from 00 "Service Not Separately Priced by Part B" to 39 "Parenteral and Enteral Nutrition."  CMS did the same for the coverage and pricing indicators for HCPCS code B4105 for RELiZORB, effective January 1, 2019.[12]

52.     Because RELiZORB was then considered a newly coded product that was not yet on the national fee schedule for enteral nutrition therapy, on December 20, 2018, CMS issued a Technical Direction Letter ("TDL") to Medicare contractors on processing claims for RELiZORB, which directs the contractors to calculate the fee schedule amount for Q9994 and B4105 "in accordance with the gap-filling methodology in section 60.3 of Chapter 23 of the Medicare Claims Processing Manual."  Technical Direction Letter (TDL-190132) at 2 (Dec. 20, 2018).

---

[12] *See* HCPCS Code B4105, https://hcpcs.codes/b-codes/B4105/ (last visited Apr. 27, 2020) (HCPCS B4105 RELiZORB code identified as Parenteral and Enteral Nutrition); 2019 Corrections to the Alpha-Numeric HCPCS File, CMS.gov, https://www.cms.gov/Medicare/ Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS-Items/2019-Corrections-to-Alpha-Numeric-HCPCS-File (last visited Apr. 29, 2020); Press Release, Alcresta Therapeutics, Inc., Alcresta Therapeutics Announces that RELiZORB® iMMOBILIZED LIPASE CARTRIDGE has been Issued a Permanent Medicare Billing Code (B4105) by the Centers for Medicare and Medicaid Services (CMS) (Dec. 27, 2018), http://www.alcresta.com/news/alcresta-therapeutics-announces-relizorb%C2%AE-immobilized-lipase-cartridge-has-been-issued.

### C.  James Henry

53.     Plaintiff James Henry is an extremely ill cystic fibrosis patient who has undergone a double lung transplant and suffers from fat malabsorption.  His official Medicare diagnosis code is E84.0 – cystic fibrosis with pulmonary manifestations.  He is forty-six years old, and at the time of his January 2018 prescription, he was 5'8" and weighed merely 136 pounds.  His physician has prescribed two cartridges of RELiZORB daily to hydrolyze the 1,000mL of supplemental enteral nutrition he needs each day to help address his diminished nutritional state and thereby improve his health.  Mr. Henry is enrolled under Medicare Part B and uses Medicare coverage of RELiZORB to obtain this product, filing a claim each month for his use, which amounts to two boxes of 30 cartridges each per month.

### D.  Procedural History of Underlying Medicare Determination

#### 1.  *Claim Determination and Dismissal of Appeal*

54.     On behalf of Mr. Henry, the Medicare supplier Maxor National Pharmacy Services Corp. ("Maxor") submitted a Medicare claim for RELiZORB—using the new code CMS issued—for RELiZORB furnished on s September 17, 2019.  The claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $9,898.20 ($164.97 per cartridge).

55.     Through a remittance notice dated October 31, 2019, the first-level DME MAC, CGS ("the contractor"), approved payment of only $2,025.07 for two boxes of RELiZORB ($33.75 per cartridge).

56.     The beneficiary timely filed a redetermination request challenging this payment decision on December 10, 2019, via fax and priority mail to CGS.  The beneficiary challenged the payment, *inter alia*, on the basis of CGS's incorrect application of the required gap-filling methodology.

57.     Upon redetermination, by letter dated January 7, 2020, CGS upheld its initial decision.  CGS stated that "there do not appear to be any errors impacting the payment amount, which is the maximum allowed by Medicare for this service."  Letter from CGS, DME MAC Jurisdiction C to Stephanie Webster on behalf of J. Henry at 4, re: Appeal No. 19344000777 (Jan. 7, 2020) (redetermination unfavorable).

58.     The beneficiary then requested reconsideration by MAXIMUS Federal Services, the second-level Medicare appeal contractor.  On February 18, 2020, MAXIMUS dismissed the administrative appeal on the grounds that a gap-filling payment determination is not appealable. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of J. Henry, re: Medicare Appeal No. 1-9203449745 (H.H.S. Feb. 20, 2020) (reconsideration dismissal).

59.     On March 16, 2020, at the third level of appeal, an HHS Administrative Law Judge dismissed the beneficiary's request for review of the dismissal and upheld MAXIMUS's dismissal determination, also stating that the claim was not subject to administrative appeal.   Letter from Monica Metz, ALJ, Office of Medicare Hearings and Appeals to Stephanie Webster on behalf of J. Henry at , re: OMHA Appeal No. 3-9203449745 (Mar. 30, 2020) (order of dismissal)

## 2.  *Incorrect Application of the Gap-Filling Methodology Underlying the Medicare Payment Determination*

60.     As noted above, CGS was required to apply the agency's gap-filling rules to determine the payment on Mr. Henry's RELiZORB claim.   *See* 42 U.S.C.  § 1395u(s) (administering Part B based on reasonable charges); 42 U.S.C.  § 1395m(a)(2)-(3), (8)-(9) (mandating that the fee schedule amounts for DME generally be based on average reasonable charges increased by annual covered item update factors); 42 C.F.R. § 414.102(a); 66 Fed. Reg. at 45,174; 72 Fed. Reg. at 18,050; Manual, ch. 23, §§ 60, 60.3.  CGS incorrectly applied the Medicare

rules governing the calculation of the gap-filled payment amount for RELiZORB and significantly underpaid Mr. Henry's claim.

61.    How CGS arrived at the payment amount is unclear from the determination itself. According to information from CMS, however, CGS incorrectly applied the gap-filling methodology by using the wrong starting point to determine a gap-filled fee schedule amount, and applying the incorrect deflation factor and cumulative covered item update factors, in violation of the Medicare statute and related agency rules. To start its calculations for average reasonable charges, the contractor apparently considered the supplier's acquisition cost instead of price lists or charges to the seller or payor.

62.    Had CGS followed the gap-filling rules required by Medicare statutes and agency rules, it would have determined that the proper fee schedule amount for two boxes of RELiZORB cartridges is $8,445.98 (based on the reasonable charges and proper update factors), and payment amount would be 80 percent of that, or $6,756.78 ($112.61 per cartridge).

63.    As described above, the Manual explains that the gap-filling process requires updating the base year reasonable charges for an item to the current year's price by deflating current charges to the relevant base year, then updating that figure to reflect increases in the consumer price index over time. *See supra* ¶ 20 (citing, *e.g.*, Manual, ch. 23, §§ 60, 60.3; 42 C.F.R. § 414.102(a) (requiring payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service")). The gap-filled fee schedule amount for RELiZORB thus should be calculated based on reasonable charges by the supplier. *See supra* ¶ 14 (citing Medicare rules requiring calculation of reasonable charges, *e.g.*, 42 U.S.C. §§ 1395u(s), 1395m(a)(2)-(3), (8)-(9); P.L. 105-33 § 4315; 83 Fed. Reg. at 57,046).

64.     For purposes of deriving payment for DMEPOS, "reasonable charge determinations are generally based on customary and prevailing charges derived from historic charge data." 72 Fed. Reg. 17,992, 17,994 (Apr. 10, 2007).  According to the Manual, to determine customary charges, Medicare contractors are required to use, "to the extent possible, the actual charges for services rendered during the year ending June 30 immediately preceding the start of the fee screen year."  Manual, ch. 23, § 80.3.l.

65.     But, the Manual calls for the use of other data for "new services," *id.* § 80.2, and provides that "[c]ustomary charges may be established using price lists" of the supplier "when there is inadequate charge data," *id.* § 80.3.1.  *See also id.* § 60.3 (discussing use of "supplier price lists" in gap-filling).  "In this case, use only the fees charged and the price lists in effect as of December 31 of the data base year."  *Id.*  The Manual separately provides that "i[f] it is necessary to establish customary charges using price lists, DME MACs use these customary charges to also establish the required prevailing charges (*See* § 80.3.1.)."  So, to determine both customary and prevailing charges, the DME MAC should look at the supplier's charges as of December 31 of the base year designated by CMS.

66.     The base year for enteral nutrition items on the fee schedule is 1995.  RELiZORB did not exist at that time and did not even receive a separate HCPCS code until December 2018.[13]  The reasonable price charged by the supplier for RELiZORB reflected in the remittance notices associated with this claim should therefore be the starting point for a gap-filling calculation.

---

[13] *See* 2019 Corrections to the Alpha-Numeric HCPCS File, CMS.gov, *supra* note 12 (HCPCS code Q9994 effective Dec. 3, 2018 (temporary RELiZORB code), and HCPCS code B4105 effective Jan. 1, 2019); HCPCS Code B4105, https://hcpcs.codes/b-codes/B4105/ (last visited Apr. 27, 2020).

67.     The supplier Maxor's list price for RELiZORB, reflected as the amount charged on the claims submitted for the product was $9,898.20 for two boxes of cartridges.  The gap-filled fee schedule amount for RELiZORB should be calculated based on that list price.

68.     Data from other suppliers of RELiZORB reflects that Maxor's price is within the range of charges by other suppliers of the device.  Indeed, several plans, including CIGNA, Medical Mutual, Great West Healthcare, United Health Care, Blue Cross Blue Shield, and Meritain Health, paid suppliers amounts higher than Maxor's charges to Medicare.  Maxor, the sole Medicare supplier for RELiZORB at the time, had an acquisition cost of $3,841.20 for two boxes of cartridges ($64.02 per cartridge) at the time of the claim at issue here.  Non-Medicare payments are generally between 20 and 160 percent above acquisition cost, with some payments as high as 175 percent above the pharmacy's cost.[14]  Medicare, on the other hand, for a charge of $9,898.20 for two boxes ($164.97 per cartridge), only reimbursed $2,025.07 ($33.75 per cartridge).  For two boxes, Medicare's payment is approximately $1,300 lower than the wholesale acquisition price, and more than 47 percent below acquisition cost.  From December of 2018 to May of 2019, the supplier Foundation Care was reimbursed for its full charges of $4,032 for two boxes of 30 cartridges ($67.20 per cartridge) on its claims for RELiZORB—twice what Medicare paid.[15]  And Foundation Care's charges are the lowest of the private payor charges reflected in this data at any wholesale list price.[16]

---

[14] We note that only two or three claims out of 171 claims show lower than 20 percent paid over acquisition cost, which we understand reflect the pharmacy's inability to adjust quickly to a change in wholesale price.

[15] Payments from private payors often are the result of a pre-authorization process that typically involves a negotiated letter of agreement that sets a price, discount, or both between the pharmacy and the payor.  This accounts for the payment that is equal to the charge for Foundation Care.

[16] Foundation Care's charges increased to $4,752 in May 2019, commensurate with an increase in the wholesale price of RELiZORB.  United Healthcare continued to reimburse Foundation Care for the full amount for these higher charges.

69.     Having determined the reasonable charges, CGS next should have applied the relevant adjustment factors:  the deflation factor and cumulative covered item update factors. Manual, ch. 23, § 60.3.

70.     According to information received from CMS, the agency has instructed its contractors to use the deflation factor for 2016, the year after RELiZORB's manufacturer first applied for a HCPCS code.[17]  The deflation factor specified in the Manual for 2016 is 0.633. Manual, ch. 23, § 60.3.

71.     The update factors according to CMS are:  2002: 0.0%[18]; 2003: 1.1%; 2004: 2.1%; 2005: 3.3%; 2006: 2.5%; 2007: 4.3%; 2008: 2.7%; 2009: 5.0%; 2010: 0.00%; 2011: -0.1%; 2012: 2.4%; 2013: 0.8%; 2014: 1.0%; 2015: 1.5%; 2016: -0.4%; 2017: 0.7%; 2018: 1.1%; and 2019: 2.3%.

72.     Applying the gap-filling methodology to this claim and deflating the list price for two boxes of RELiZORB of $9,898.20 by the 2016 factor of 0.633 yields a base year approximated amount of $6,265.56.  The product of the above annual updates is 1.348.  Applying that cumulative factor to the deflated charges of $6,265.56, the gap-filled fee schedule amount would be $8,445.98 for this claim (two boxes of 30 cartridges per box).

73.     Payment would thus be $6,756.78 (or 80% of the gap-filled fee schedule amount) for two boxes of RELiZORB ($112.61 per cartridge).[19]  *See* 42 C.F.R. § 414.102(a) (requiring

---

[17] Note, however, that no separate code was available until December 2018 and did not become effective until January 1, 2019.  No public sources specify which year is to be used.

[18] The beneficiary contends that in addition to these adjustment factors, the following adjustment factors for 1996 through 2001 should also be applied:  for 1996—2.8 percent (P.L. 105-33 § 4551(a)(l)(B)(i)); for 1997—2.3 percent (*id.*); for 1998-2000—0 percent (P.L. 105-33 § 4551(a)(l)(C)); and for 2001—0.3 percent (P.L. 106-113 § 228(a)(l)).

[19] If the beneficiary's proposed adjustment factors for 1996 to 2001 are used, *see supra* note 18, then the product of the update factors is 1.423, which results in a gap-filled fee schedule amount of $8,915.89 and payment of $7,132.71.

payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service" for a newly coded product that is not yet on the national fee schedule), not the $2,025.07 paid by CGS ($33.75 per cartridge).

74.     Because the Medicare payment amount for RELiZORB was calculated incorrectly, it is significantly lower than amounts paid by private insurance payors for non-Medicare patients' claims for RELiZORB.  Payments by private payors for RELiZORB show that, across the board, they reimburse at levels above the acquisition cost to the specialty pharmacy that more closely reflect the charges by those supplier pharmacies.

75.     In contrast, Medicare's current payment amount is nearly 40 percent below Maxor's acquisition cost:  Maxor pays $3,841.20 to acquire two boxes of RELiZORB yet was only reimbursed $2,025.07 for those boxes by Medicare.

### 3.   *Consequences of the Unreasonable Medicare Determination*

76.     Medicare's coverage of RELiZORB *below* the supplier's cost of acquiring the product creates an unsustainable revenue loss for suppliers that effectively removes RELiZORB as a covered item for Medicare beneficiaries. The gross Medicare underpayment will ultimately leave Medicare beneficiaries like Mr. Henry without the treatment RELiZORB provides unless they can afford to pay out of pocket for it—further restricting Medicare patient access to the novel product and increasing other out-of-pocket healthcare costs.[20]  This revenue shortfall, in turn, will limit Alcresta's ability to manufacture RELiZORB to meet the needs of its users.  *See Alcresta*, 755 F. App'x at 5 (concluding Alcresta has demonstrated it faces irreparable harm if patients who need RELiZORB cannot get insurance reimbursement for its cost).

---

[20] Presentation and Statement of D. Tassé at June 8, 2017 HCPCS Public Meeting; Letter to CMS from Asembia (Aug. 23, 2017); Letter to CMS from Option Care (June 6, 2017).

77.     In addition, private and other payors look to Medicare for guidance on how to pay for RELiZORB.  Medicare's underpayment for the product affects the entire market for RELiZORB.[21]  Without sufficient Medicare payment levels for RELiZORB—Alcresta's lead and only product—it may be unable to continue operations.

78.     Medicare coverage and payment issues for RELiZORB have already imposed irretrievable economic losses, measured in millions of dollars, on Alcresta.  Without a change in reimbursement, Alcresta will be unable to provide RELiZORB to medically fragile Medicare patients, and indeed all of the most critically ill patients requiring RELiZORB if revenue losses force Alcresta to shut down its distribution of this product entirely.

79.     The agency's refusal to provide coverage for RELiZORB also operates to chill the incentive of companies like Alcresta to invest in and develop products that help small populations of patients who suffer from rare conditions.

## VI.     ASSIGNMENT OF ERRORS

80.     The Administrative Procedure Act ("APA") provides for a reviewing court to "set aside" the agency's final payment determination if, inter alia, it is arbitrary, capricious, unsupported by substantial evidence in the record, contrary to law, or without observance of procedure required by law.  5 U.S.C. § 706(2).

81.     Under the APA, the Medicare payment determination should be set aside for reasons including those described below.

---

[21] *See, e.g.*, Jeffrey Clemens & Joshua D. Gottlieb, *In the Shadow of a Giant:  Medicare's Influence on Private Physician Payments*, J. Polit. Econ. (Feb. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5509075/ (explaining how private insurers often mimic Medicare); Roger Feldman et. al, *Medicare's Role in Determining Prices Throughout the Health Care System*, George Mason Univ. (Oct. 8, 2015), https://www.mercatus.org/publications/government-spending/medicare%E2%80%99s-role-determining-prices-throughout-health-care-system (explaining the influence of Medicare payments on private-sector payments).

**COUNT I – MEDICARE PAYMENT DETERMINATION IS CONTRARY TO LAW**

82.     Plaintiffs incorporate paragraphs 1 through 81.

83.     The contractor's payment on Mr. Henry's claim for the service date September 17, 2019 was contrary to law because it did not properly apply the Medicare statute and rules governing the payment amount based on reasonable charges for this claim, it violated the NCD providing for coverage of Enteral and Parenteral Nutritional Therapy, and contravened the D.C. Circuit's mandate for a useable code to open the path toward coverage and reimbursement for Medicare beneficiaries.

84.     The Medicare payment determination for RELiZORB violates the Medicare payment requirements for new items because it did not apply the gap-filling methodology as required to determine the charge-based payment for newly coded products that are not yet on the national fee schedule.  42 C.F.R. § 414.102(a) (requiring payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service"); 83 Fed. Reg. at 57,046 (describing the gap-filling process for establishing fees for new DMEPOS items as approximating reasonable charges); Manual, ch. 23, §§ 60, 60.3.  The determination of a gap-filled amount requires:  (1) a determination of reasonable charges; and (2) an application of the gap-filling rules and deflation and update factors to those reasonable charges.  42 U.S.C. § 1395u(s); 42 U.S.C. § 1395m(a)(2)-(3), (8)-(9) (mandating that the fee schedule amounts for DME generally be based on average reasonable charges from 1986 and/or 1987, increased by annual covered item update factors); P.L. 105-33 § 4315; 42 C.F.R. § 414.102(a); 72 Fed. Reg. at 18,050; 83 Fed. Reg. at 57,046; Manual, ch. 23, § 60.3 (describing the gap-filling process, including deflation and update factors); 42 U.S.C. § 1395m(a)(14)(L).

85.     Payment for RELiZORB should plainly be determined using this gap-filling methodology because RELiZORB was considered a newly coded product that was not yet on the national fee schedule.[22]   Indeed, the agency's own instruction implementing the D.C. Circuit injunction directed the contractors to gap-fill.  Technical Direction Letter (TDL-190132) at 2 (Dec. 20, 2018) (directing the contractors to calculate the fee schedule amount for Q9994 and B4105 "in accordance with the gap-filling methodology in section 60.3 of Chapter 23 of the Medicare Claims Processing Manual").

86.     Proper calculation of Mr. Henry's payment using this methodology results in a proper fee schedule amount of $8,445.98 for two boxes of 30 RELiZORB cartridges (based on the reasonable charges and proper update factors), and the payment amount should be 80 percent of that, or $6,756.78 ($112.61 per cartridge).  According to information from CMS, the contractor used the supplier's acquisition cost as its starting point instead of any calculation of reasonable charges, and then applied the wrong update factors to that amount to arrive at a payment determination of only $2,025.07 ($33.75 per cartridge).  This conflicts with CMS's own rules for determining reasonable charges; CMS itself has explained that the retail price charged by the supplier is key to this calculation, not the cost to the supplier, 84 Fed. Reg. 60,648, 60,730 (Nov. 8, 2019), because gap-filled payment amounts are intended to reflect "costs associated with furnishing items directly to the customer."  *Id.* at 60,740.  CGS's determination reflects none of these factors.  Additionally, this Medicare payment is grossly out of line with non-Medicare payors, further evidencing that CGS miscalculated reasonable charges and arrived at an improper payment.  Non-Medicare payments are generally between 20 and 160 percent above acquisition cost, with some payments as high as 175 percent above the pharmacy's cost.  This Medicare

---

[22] *See* Press Release, Alcresta Therapeutics, Inc., *supra* note 12.

payment is 47 percent *below* the acquisition cost.  Even the lowest of the private payor charges reflected in data at any wholesale list price, Foundation Care, was reimbursed for its full charges of $4,032 on its claims for two boxes of RELiZORB from December of 2018 to May of 2019— twice what Medicare paid.  The agency's failure to apply the gap-filling methodology violates the Medicare payment rules and led to the underpayment of Mr. Henry's claim.

87.     This payment determination is also invalid because the denial of adequate payment constitutes a change from coverage of medically necessary enteral nutrition and supplies to non-coverage, in violation of both the statutory coverage provided for enteral nutrition and supplies, *see* 42 U.S.C. §§ 1395k(a)(2)(B), 1395k(a)(2)(l), and the Secretary's 1984 NCD for Enteral and Parenteral Nutritional Therapy (180.2).  Medicare Part B covers prosthetic devices, including enteral nutrition and supplies.  42 U.S.C. §§ 1395k(a)(2)(B), 1395k(a)(2)(l); 42 C.F.R. § 421.210(b)(2) (designating DME claims as including enteral nutrition and supplies); Medicare Benefit Policy Manual, ch. 15, § 120.A; Medicare Claims Processing Manual, ch. 20, § 10.  As described above, RELiZORB is an important component of enteral nutrition for individuals who, like Mr. Henry, suffer from severe fat malabsorption.  RELiZORB is also covered by the NCD for Enteral and Parenteral Nutritional Therapy (180.2) when deemed medically necessary, and that coverage determination is binding unless the NCD is formally amended.  42 U.S.C. § 1395ff(f)(1)(B); 42 U.S.C. § 1395y(l)(6)(A); *accord* Letter from Alex Azar to Mark Langer, *supra* ¶ 49 (listing RELiZORB sequentially with other supplies and formula that fall under the NCD 180.2 that are also identified by B-four thousand codes).  No such amendment was made.  Denial of coverage therefore violates both Medicare rules.

88.     In addition, non-coverage of RELiZORB violates the D.C. Circuit's order that the Secretary remove coding barriers to payment.  *See Alcresta*, 755 F. App'x at 6.  Finding that

"Relizorb's encumbered code acts as an absolute barrier to meaningful reimbursement," the Court ordered the Secretary to "assign RELiZORB a temporary billing code that is not encumbered by Medicare coverage indicators that treat RELiZORB as a component of the enteral feeding supply kit (coded as B4035) not separately priced or payable." *Id.* at 2, 5.  In direct contravention of the Court's order to remove barriers to coverage and clear a path for payment for RELIZORB, CMS functionally denied coverage altogether.

89.    The agency's final decision was therefore contrary to law and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT II – MEDICARE PAYMENT DETERMINATION WAS ARBITRARY AND CAPRICIOUS

90.    Plaintiffs incorporate paragraphs 1 through 89.

91.    The Medicare payment determination is arbitrary and capricious because it started from an unreasonable assessment of reasonable charges and approached gap-filling payment for RELiZORB differently than for other products, and without explanation for the departure.  5 U.S.C. § 706(2)(A).

92.    An administrative decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"; did not "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"; "offered an explanation for its decision that runs counter to the evidence before the agency"; or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

93.    The Medicare payment determination fails on all accounts.  In using the cost to the supplier of acquiring RELiZORB as its starting point, CMS "entirely failed to consider an

important aspect of the problem"—its duty to determine the reasonable *charges* of RELiZORB.
*See* 42 U.S.C. § 1395u(s) (administering Part B based on reasonable charges); 42 U.S.C. §
1395m(a)(2)-(3), (8)-(9); P.L. 105-33 § 4315; 84 Fed. Reg. 60,648, 60,730 (Nov. 8, 2019) ("[T]he
gap-filling process is used to estimate what Medicare would have paid for the item under the
reasonable charge payment methodology" that was previously in effect.).  According to CMS
itself, those charges are more than merely the acquisition price.  As noted above, CMS has stated
in the context of rulemaking that the retail price charged by the supplier—not the cost to the
supplier—is key because gap-filled payment amounts are intended to reflect "costs associated with
furnishing items directly to the customer, including overhead and all business expenses such as
licensure and accreditation, debt collection, credit cards, filing health insurance claims, delivery,
set-up, and education."  84 Fed. Reg. at 60,740.  The Medicare payment entirely fails to account
for these considerations.  There is no "rational connection" between this starting point using the
*cost* to the supplier and the resultant Medicare payment that purports to reflect reasonable *charges*.

94.     Nor has the agency offered any explanation for its decision, and indeed it cannot
offer a rational explanation that is not rebutted by the evidence of reasonable charges in the record
that the agency disregarded.  This evidence shows that non-Medicare payments are generally
between 20 and 160 percent above acquisition cost, with some payments as high as 175 percent
above the pharmacy's cost, but that conversely, Medicare's payment is approximately $1,300
lower than the wholesale price, and more than 47 percent below acquisition cost.  CMS fails to
explain why its payment on reasonable charges is so far out of line with other payors'
determinations.  Moreover, the fact that the Medicare determination is *below* the supplier's
acquisition cost and requires suppliers to provide RELiZORB to Medicare beneficiaries at a *loss*

is, in and of itself, "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

95. Further, CGS offers no rationale for its determination, which is also arbitrary and capricious in and of itself. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (A "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)); *WMI Liquidating Tr. v. Fed. Deposit Ins. Corp.*, 110 F. Supp. 3d 44, 53 (D.D.C. 2015) ("An agency may be said to have acted arbitrarily or capriciously when it disregards its established policy without adequate explanation."). In particular, the decision must explain why it departs from the established methodology, which the agency said would apply when coming into compliance with the D.C. Circuit's mandate, for arriving at a gap-filled payment amount. "A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing cases). The agency may change its standards, but to do so it must provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Lone Mountain Processing, Inc. v. Sec'y of Labor,* 709 F.3d 1161, 1164 (D.C. Cir. 2013) (internal quotation marks and citation omitted). CMS has not explained why it "chose to do what it did." *Amerijet*, 753 F.3d at 1350 (internal quotation marks and citation omitted).

96. The agency's final decision regarding payment of RELiZORB was therefore arbitrary and capricious, and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT III –MEDICARE PAYMENT DETERMINATIONWAS NOT BASED ON SUBSTANTIAL EVIDENCE

97. Plaintiffs incorporate paragraphs 1 through 96.

98.     The agency's payment determination is also unsupported by substantial evidence and should be set aside as unlawful.  There is no apparent connection between the starting point CGS used—the cost to the supplier for acquiring the product—and its payment determination that the appropriate, reasonable charge-based payment for Mr. Henry's RELiZORB claim is only $2,025.07.  As noted above, in the absence of historical base year data, CMS was required to use Alcresta's actual customary charges as the starting point for calculating the gap-filled fee schedule payment amount.  *See supra* ¶ 22-23, 64-65.  CGS's decision to use cost data rather than charge data is not supported by any evidence.  Instead, all of the evidence indicates that the correct application of the gap-filling process starts with the supplier Maxor's list price for RELiZORB, reflected as the amount charged on the claims submitted for the product.  Without any evidence supporting CGS's unexplained and unfounded conclusion to the contrary, it must be set aside.  5 U.S.C. § 706(2)(A).

99.     "Substantial evidence is 'more than a mere scintilla' and means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  *See also Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." (quoting *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir.) (internal quotation omitted), *cert. denied*, 540 U.S. 946 (2003)); *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996).  Although the reviewing court must subject the agency's decision to searching, careful, and close judicial scrutiny, *see Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 350-53 (D.C. Cir. 1987), this Medicare determination cannot be upheld on this record that is devoid of any evidence that the cost to the supplier should be considered as the starting point for calculating

reasonable charges under the applicable Medicare reimbursement rules and principles. Plaintiff's evidence of other payors' reimbursements also "fairly detracts" from CGS's determination. *See AT&T Corp.*, 86 F.3d at 247 (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account "whatever in the record fairly detracts from its weight." (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951))). Plaintiffs' evidence proves that Medicare reimbursement for RELiZORB lags far behind reimbursement from other payors. *See supra* ¶ 68 (Medicare payment is half of the *lowest* private payor reimbursement, and 47 percent below its acquisition price, while typical non-Medicare payments are generally 20 to 160 percent above acquisition cost). The record flatly does not contain "relevant evidence as a reasonable mind might accept as adequate" to support Medicare's gross underpayment. *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison,* 305 U.S. at 229).

100.    The agency's final decision was therefore unsupported by substantial evidence and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

### COUNT IV – MEDICARE PAYMENT DETERMINATION ISSUED WITHOUT OBSERVANCE OF REQUIRED PROCEDURE

101.    Plaintiffs incorporate paragraphs 1 through 100.

102.    The agency's payment determination for RELiZORB changed the substantive legal standard governing Medicare benefits and payment for enteral nutrition therapy, and effectively amended the Secretary's NCD for Enteral and Parenteral Nutritional Therapy, but was issued without observance of the required procedure pursuant to the Medicare rules and the Administrative Procedure Act and without providing fair notice. *See* 5 U.S.C. § 706(2); 42 U.S.C. § 1395hh(a)(2); 5 U.S.C. §§ 553, 706(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) ("*Allina II*"), *aff'd sub nom. Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019)

("*Allina III*").  The agency did not provide *any* notice or opportunity for public comment of any change in the gap-filling methodology or for effectively amending the Secretary's determination to provide nationwide coverage for medically necessary enteral nutrition and supplies—like RELiZORB has been deemed for Mr. Henry and others—before applying these changes to Mr. Henry's RELiZORB claim.

103.     The Medicare Act, "require[s] the government to provide public notice and a 60-day comment period (twice the APA minimum of 30 days) for any 'rule, requirement, or statement of policy . . . that establishes or changes a substantive legal standard governing . . . payment for services," among other categories.  *Allina III*, 139 S. Ct. at 1809 (quoting 42 U.S.C. § 1395hh(a)(2)).  *See also Allina II*, 863 F.3d at 943 (ruling that the Medicare Act does not incorporate the APA's exceptions to notice-and-comment rulemaking and requires the Secretary to invoke notice-and-comment rulemaking for any "requirement" that establishes or change a binding standard that "define[s] the scope of hospitals' legal rights to payment").

104.     The agency did not provide *any* notice or opportunity for public comment of any change in the gap-filling methodology, and its decision not to follow that methodology is a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . payment for services," and thereby required, under the Medicare Statute, that the agency go through notice-and-comment rulemaking.  *See* 42 U.S.C. § 1395hh(a)(2); *Allina II*, 863 F.3d at 943, thereby violating the Medicare Act.

105.     The agency's change in procedure from using the gap-filling methodology is also invalid because it affects individual rights but was issued without observance of the APA's notice-and-comment rulemaking procedures.  *See* 5 U.S.C. § 553(b)-(c) (to satisfy APA rulemaking requirements, an agency must publish "[g]eneral notice of proposed rule making . . . in the Federal

Register" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."); *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02 (1979).  Because those procedures were not followed, the agency's action violates 5 U.S.C. § 553(b).

106.    The underpayment also reflects a substantive change from the NCD for Enteral and Parenteral Nutritional Therapy (180.2) that was issued without observance of the statutorily prescribed procedure for adopting or revising an NDC.  *See* 42 U.S.C §§ 1395y(a), 1395y(1)(3)-(4); *see also* 78 Fed. Reg. at 48,164.  The Secretary's issuance of the NCD for Enteral and Parenteral Nutritional Therapy (180.2) constituted a binding, nationwide determination that medically necessary eternal nutrition and supplies be covered under Medicare Part B.  42 U.S.C. § 1395ff(f)(1)(B); 42 U.S.C. § 1395(l)(6)(A).  Because it is medically necessary as determined by the Medicare contractor, RELiZORB is provided coverage under this NCD.[23]  The Medicare determination to effectively not provide coverage for RELiZORB where it has been deemed medically necessary is, in effect, a determination that RELiZORB is not covered by Medicare. This change from coverage of medically necessary enteral nutrition and supplies to non-coverage effectively amended the NCD, and was completed without observance of the required procedures—which include notice and opportunity for public comment on a draft proposed determination, on-the-record meetings of an advisory committee, consideration of evidence, and a clear statement in the final determination of the basis for the determination.  42 U.S.C. §§ 1395y(a), 1395y(l)(3)-(4).

---

[23] *See* HCPCS Code B4105, https://hcpcs.codes/b-codes/B4105/ (last visited Apr. 27, 2020) (HCPCS B4105 RELiZORB code identified as Parenteral and Enteral Nutrition); *accord* Letter from Alex Azar to Mark Langer, *supra* ¶ 49 (listing RELiZORB sequentially with other supplies and formula that fall under the NCD 180.2 that are also identified by B-four thousand codes).

107.    The agency did not provide fair notice of the change to the gap-filling methodology or for violating the NCD for Enteral and Parenteral Nutritional Therapy by not providing coverage for RELiZORB where it has been deemed medically necessary for Mr. Henry, and its application of these unpublished standards is unlawful.  42 U.S.C. § 1395hh; *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007).  It is well settled in the Medicare context specifically, and under administrative law principles more generally, that an agency cannot apply an interpretation of its rules to penalize a party that did not have "fair notice" of the agency's view with "ascertainable certainty" that due process requires.  The concept of fair notice is especially heightened under the Medicare Act.  *See* 42 U.S.C. § 1395hh (prescribing procedural requirements the Secretary must observe when making substantive changes to legal standards); *Allina III*, 139 S. Ct. at 1809.

108.    An agency may not impose liability on a party "for conduct that occurred well before [an] interpretation was announced.  To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'"  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012) (citation omitted).  A regulated party has fair notice of the substance of a rule only when, "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform."  *Gen. Elec. Co. v. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("*Gen. Elec. I*"); *see also Loma Linda Univ. Med. Ctr. v. Sebelius*, 408 F. App'x 383 (D.C. Cir. 2010) (*per curiam*) (affirming the Court's reversal of Medicare reimbursement denial where the appellee hospital "did not receive notice 'with ascertainable certainty'") (quoting *Gen. Elec. I*, 53 F.3d at 1329); *Hosp. of the Univ.*

*of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 135-42 (D.D.C. 2012) (reversing a denial of Medicare payment due to lack of fair notice of the agency's interpretation of its regulations); *Grancare, Inc. v. Shalala*, 93 F. Supp. 2d 24, 31-34 (D.D.C. 2000) (reversing the Secretary's disallowance of Medicare reimbursement because the agency did not afford affected skilled nursing facilities fair notice of the agency's interpretation of its rules). "The very concept of 'notice' of a regulatory requirement is that the government has appropriately informed the regulated community before penalizing it for noncompliance." *Hosp. of the Univ. of Pa.*, 847 F. Supp. 2d at 141.

109. The agency's change from following the gap-filling rules in determining Mr. Henry's claim and essential non-coverage determination for RELiZORB despite the NCD providing coverage constitute substantive changes in the Medicare reimbursement policy requiring fair notice of any change before the party is expected to conform to or be subject to the new standard. The agency did not provide fair notice of the rules prior to their enforcement, and those rules were not otherwise ascertainable to Mr. Henry, and the payment determination based on these changes should thus be vacated.

110. Even if notice-and-comment rulemaking was not required here (which it is), the agency did not publish any standard to support the substantive changes to the gap-filling policy for newly coded products or to the coverage provided by the NCD for Enteral and Parenteral Nutritional Therapy to medically necessary enteral nutrition and supplies, and the agency may not rely upon an unpublished standard to support a retroactive disallowance of Medicare cost reimbursement. *See Chippewa Dialysis Servs.*, 511 F.3d at 176-77 (citing 42 U.S.C. § 1395hh(c)(1) to require the Secretary to publish "all manual instructions, interpretive rules, statements of policy and guidelines of general applicability" in the Federal Register, at least every three months). The Medicare statue explicitly forbids applying such a "substantive change in

regulations, manual instructions, interpretive rules, statements of policy, or guidelines of general applicability . . . retroactively to items and services furnished before the effective date of the change," except in limited circumstances enumerated in the statute.  42 U.S.C. § 1395hh(e)(1)(A).

111.    The agency's final decision was therefore issued without observance of procedure required by law and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

## VII.    RELIEF REQUESTED

For the foregoing reasons, Plaintiffs request that the Court:

a) declare that the Medicare payment determination for RELiZORB is inconsistent with the Medicare statute and rules for gap-filling payment amounts and coverage for enteral nutrition;

b) declare the payment determination arbitrary and capricious and not based on substantial evidence;

c) declare that the application of a new payment standard violates the procedural requirements of the Medicare Act and the APA;

d) set aside the invalid payment determination and direct the agency to require its contractor to apply properly the gap-filling methodology set forth in the Medicare statute and rules;

e) enjoin the agency from using, or relying upon, the erroneous payment methodology with respect to RELiZORB;

f) direct HHS to pay Plaintiffs' legal fees and other costs of suit; and

g) provide such other relief as the Court may deem appropriate.

Respectfully submitted,

*/s/ Stephanie A. Webster*
Stephanie A. Webster
  D.C. Bar No. 479524
Michael J. McDougall
  D.C. Bar No. 1023610
Rachel H. Jennings
  D.C. Bar No. 241370
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006-6807
t: (202) 508-4859
f: (202) 383-9334
stephanie.webster@ropesgray.com

*Attorneys for Plaintiffs*

Dated:  May 1, 2020